# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Robert W. Gettleman | Sitting Judge if Other than Assigned Judge | Geraldine Soat Brown |
|---|---|---|---|
| **CASE NUMBER** | 02 C 8181 | **DATE** | 1/20/2004 |
| **CASE TITLE** | Robin vs. Robin, et al. | | |

**MOTION:**

[In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Report and Recommendation to the Honorable Robert W. Gettlemen recommending that Defendants' Motion to Enforce Settlement Agreement [30-1] be granted. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the District Court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this Court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | Document Number |
|---|---|---|---|---|---|
| | No notices required. | | number of notices | | |
| ✓ | Notices mailed by judge's staff. | | JAN 21 2004 | | |
| | Notified counsel by telephone. | | date docketed | | 44 |
| | Docketing to mail notices. | | docketing deputy initials | | |
| | Mail AO 450 form. | | 1/20/2004 | | |
| ✓ | Copy to judge/magistrate judge. | | date mailed notice | | |
| GR | courtroom deputy's initials | | GR mailing deputy initials | | |

# UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | | |
|---|---|---|
| STEPHEN H. ROBIN, | ) | |
| Plaintiff, | ) | Cause No. 02 C 8181 |
| | ) | |
| v. | ) | Judge Robert W. Gettleman |
| | ) | Magistrate Judge Geraldine Soat Brown |
| RICHARD J. ROBIN, et al., | ) | |
| Defendants. | ) | |

To: Honorable Robert W. Gettleman,
    United States District Judge

## REPORT AND RECOMMENDATION

Geraldine Soat Brown, United States Magistrate Judge

This case comes to be heard on the Motion to Enforce Settlement Agreement filed by Defendants Richard J. Robin, Eric C. Kant, Robin Realty and Management Company, and Robin Construction Corporation (collectively, "Defendants"). [Dkt 30.] Defendants request that a settlement agreement that they claim was reached with Plaintiff Stephen Robin ("Plaintiff") be enforced and that the case be dismissed with prejudice. The District Judge referred Defendants' motion to this court. [Dkt 31.] The parties submitted memoranda of law and exhibits including affidavits and excerpts of Plaintiff's deposition transcript. Oral argument was heard on the motion. For the following reasons, this court respectfully recommends that Defendants' motion be granted.[1]

---

[1] This ruling takes the form of a Report and Recommendation because the outcome of granting Defendants' motion is the termination of Plaintiff's claims. 28 U.S.C. § 636(b)(1)(A) and (C).

## FINDINGS OF FACT AND CONCLUSIONS OF LAW

### Factual Background

This lawsuit arises out of a dispute regarding commercial real estate in Oak Lawn, Illinois, known as the Green Oaks Shopping Center ("Green Oaks"). (Am. Compl. ¶ 1.) [Dkt 5.] The title to Green Oaks is held by a land trust. (*Id.* at ¶ 3.) Originally, Albert Robin, the father of Plaintiff and one of the defendants, Richard Robin, was the sole holder of the beneficial interest of the trust. (*Id.* ¶ 11.) Presently, the beneficial interests of the trust are owned by Plaintiff, defendant Richard Robin, and defendant Eric Kant. (*Id.* ¶ 16, 17.) According to Defendants, Richard Robin and Eric Kant have worked in the Robin businesses for many years while Plaintiff has not been actively involved in the Robin businesses for years. (Defs.' Mot. ¶ 1.) Plaintiff alleges that Richard Robin and Eric Kant assumed primary responsibility for managing Green Oaks at least from the 1990's. (Am. Compl. ¶ 21.)

Plaintiff's Amended Complaint, filed on January 17, 2003, alleges six counts and is premised on the existence of a joint venture among Plaintiff, defendant Richard Robin, and defendant Eric Kant. (Am. Compl. ¶ 1.) The alleged business of the venture was to own, operate and share in the profits from Green Oaks. (*Id.*) Plaintiff alleges, *inter alia*, that Defendants improperly deducted from the profits of Green Oaks and diverted to themselves a "management fee" of approximately 4% of the annual revenue of Green Oaks. (*Id.* ¶ 22, 23.) In the Amended Complaint Plaintiff seeks, among other things, dissolution of the alleged joint venture, sale of the property (Green Oaks) and all improvements thereon, and division of the sale proceeds among the three holders according to their respective interests, including the allegedly diverted "management fees" and "commissions." (Am. Compl. at 8; ¶ 40, 43.) Defendants deny that either a joint venture or partnership exists, or that

Plaintiff is entitled to any of the management fees paid to Robin Realty, the real estate firm operated by Richard Robin and Eric Kant which has managed Green Oaks for many years. (Defs.' Mot. ¶ 2.) In his Memorandum in Opposition to Defendants' Motion ("Opposition"), Plaintiff states that, after repeated demands, Richard Robin and Eric Kant finally consented to pay Plaintiff 50% of the management fees, but have failed to do so for the years 2002 and 2003. (Pl.'s Opp'n at 2.) However, Plaintiff's cites no factual support for that statement, and such an agreement is not alleged in Plaintiff's Amended Complaint.

Following the referral of this case for discovery supervision and settlement conference [dkt 11], this court conducted a number of in-person and telephone settlement conferences to try to resolve this matter. (Defs.' Mot. ¶ 3; Defs.' Mot., Ex. 1, Decl. of Alan S. Rutkoff ¶ 2.) During one or more of those conferences, prior to July 18, 2003, the suggestion was made that the case might be settled by a public auction of Green Oaks. (Rutkoff Decl. ¶ 3.) Plaintiff's attorney at that time, Stephen Baron, stated that Plaintiff would prefer to retain the existing ownership arrangements, but that if Plaintiff were to agree to an auction, his agreement would be conditioned on Defendants' paying the auction expenses. (Id. ¶ 4.)[2] Alan Rutkoff, one of Defendants' attorneys, stated that there was no reason for Defendants to pay all of the transaction costs. (Id. ¶ 5.) Both attorneys stated that they did not know what the cost would be to auction the property. (Id.) Counsel for the parties were then ordered to serve on the other party an estimate of the costs of having the property sold by public auction. (Order, June 17, 2003.) [Dkt 23.] On approximately June 23, 2003, Mr. Rutkoff received a written proposal (solicited by Plaintiff) from a firm that is in the business of auctioning real estate,

---

[2] Mr. Baron withdrew from the case shortly before the filing of Defendants' motion. [Dkt. 26-27.]

DK Realty Partners, LLC, for the sale of Green Oaks by a public, "absolute" auction (i.e., "with no right of reservation on the part of the seller"). (Rutkoff Decl. ¶ 6; Defs.' Mot., Ex. A, DK Realty Proposal at 2.) The proposal set forth numerous terms, including a method of sale, DK Realty Partners' fees, the marketing costs, the timing of the auction, the timing of the closing, listing agreement requirements, and the marketing proposal. (DK Realty Proposal at 5-8.) By letter dated July 11, 2003, Catherine McCain, another attorney representing Defendants, advised Mr. Baron that if the parties reached an agreement, Defendants would accept the proposal offered by DK Realty. (Defs.' Mot., Ex. B, McCain July 11, 2003 Letter.)

A further telephone settlement conference was set for July 18, 2003. [Dkt 23.] Approximately five minutes before that conference was scheduled to begin, Mr. Baron called Mr. Rutkoff to discuss the possibility of settlement. (Pl.'s Opp'n, Ex. A, Decl. of Steven L. Baron ¶ 8-9.)[3] As further discussed in detail below, during that conversation, Mr. Baron conveyed two alternative offers of settlement. (Rutkoff Decl. ¶ 9; Baron Decl. ¶ 9.) One of the offers consisted of a sale of Green Oaks by a public, absolute auction, Defendants would pay all of the auction expenses, and Plaintiff would release claims related to Green Oaks. (Defs.' Mot. ¶ 5; Pl.'s Opp'n at 2.) The second offer also consisted of a sale of the property by a public, absolute auction, but included the conditions that each side pay half of the auction expenses and that Plaintiff retain the right to litigate all of his claims that would not be addressed by a sale of the property. (Pl.'s Opp'n at 3; Defs.' Mot. ¶ 5.)

Following their conversation, Mr. Baron and Mr. Rutkoff proceeded with their scheduled

---

[3] In several places in his Opposition, Plaintiff refers to his own affidavit as Exhibit A and Mr. Baron's declaration as Exhibit B, when, in fact, Mr. Baron's declaration is marked as Exhibit A and Plaintiff's affidavit is marked as Exhibit B. This opinion will refer to the correct exhibit letter instead of the exhibit letter that may have been incorrectly cited by Plaintiff.

telephone conference with the court. (Rutkoff Decl. ¶ 10; Baron Decl. ¶ 11.) Ms. McCain also

joined the telephone conference. (Rutkoff Decl. ¶ 15; McCain Decl. ¶ 6.) During that conference,

the lawyers agreed to go off the record to discuss with the court the progress of the settlement

discussions. Mr. Baron repeated the two settlement offers described above. (Baron Decl. ¶12;

Rutkoff Decl. ¶ 10; McCain Decl. ¶ 7.) The court asked Mr. Baron to explain why all of Plaintiff's

claims would not be resolved by an auction of the property. (Rutkoff Decl. ¶ 10; Baron Decl. ¶ 12.)

Mr. Baron responded that the Amended Complaint asserted damage claims for which Plaintiff would

not be compensated by an auction, including, for example, claims for past management fees that

were never paid to him. (Rutkoff Decl. ¶ 10; Baron Decl. ¶ 12.) In response to Mr. Baron's

settlement proposals, Mr. Rutkoff stated that he was pessimistic that his clients would accept either

proposal because Defendants did not want either a partial resolution of the case or to pay Plaintiff's

share of the auction expenses, but that he would communicate the offers to Defendants. (Rutkoff

Decl. ¶ 11; McCain Decl. ¶ 9.)

Mr. Baron did not withdraw either of the settlement offers at any time after the settlement

conference on July 18, 2003. (Rutkoff Decl. ¶ 12.) On July 30, 2003, Mr. Rutkoff sent a letter to Mr.

Baron stating:

> My clients have authorized me to accept, unconditionally, one of the offers which you
> made on behalf of [Plaintiff] both immediately prior to and during the last telephone
> status conferences with Magistrate Judge Brown on July 18, 2003. Specifically, our
> clients agree to sell the subject property in an "absolute auction" (i.e., with no right
> of reservation on the part of the sellers) in accordance with the June 20, 2003
> proposal. . . and to pay all of the expenses and commissions as set forth therein; in
> exchange for a release from [Plaintiff]. The above-referenced lawsuit can be
> dismissed with prejudice now, and we should so advise Magistrate Judge Brown at
> or before next week's court hearing.

> Please call me at your earliest convenience so that we can discuss the mechanics of

entering into a final and binding agreement with David Kaufman and getting the case dismissed with prejudice.

(Defs.' Mot., Ex. C, Rutkoff July 30, 2003 Letter.)

A status hearing was held on August 4, 2003. During that hearing, Mr. Baron stated on the record, in relevant part:

> Now I'm prepared to represent to the Court today that I do believe that we have a conceptual framework for settlement. What I told Mr. Rutkoff on the phone this morning is that, with all settlements, we're going to need to work through a document to do this. I'm sure issues will come up. I'm hoping none of them will be insurmountable.
>
> One of the issues I have already raised with him is that we don't have current financials on the property. We have financials through the yearend [sic] 2002, and so I have asked that they could prepare and just send us, you know, whatever the current financials are through midyear 2003.
>
> Short of that, Judge, I think that we ought to be able to wrap this up . . . . Mr. Rutkoff and I can meet and talk about the formula for the settlement agreement.
>
> .    .    .
>
> I also don't want to overstate it. Okay? What happened was we made a generalized conceptual proposal when we were on the telephone last time . . . . It was exactly that, a generalized proposal.
>
> .    .    .
>
> I think we have the basic concepts here . . . . But, you know, I'm reluctant to say that we have a final and binding settlement agreement on the parties.

(Defs.' Mot., Ex. D, Tr. Aug. 4, 2003 at 3, 8.) Mr. Rutkoff made the following comments, in relevant part, at the August 4, 2003 status hearing:

> [O]ur position is that the case has been settled. The property will be sold in accordance with the proposal that their chosen auctioneer came up with. And our side has agreed to bear the expenses so that we can get rid of the . . . case.
>
> .    .    .

And the acceptance that I made was unconditional for a reason, because I thought that the offer was unambiguous, it was complete, it referred to the document that we both had.

For the record, our position is that we have a final and binding agreement.

. . .

[T]he defendants's [sic] position is that the agreement to settle is more than in principal [sic], that we do have a final and binding agreement.

(*Id.* at 2-4, 7.) Mr. Rutkoff further stated that the financial information requested by Mr. Baron at the hearing was not necessary, as a binding agreement had already been reached. (*Id.*) A minute order was then entered by the court stating that "a settlement agreement has been reached in principle." (Pl.'s Opp'n, Ex. C.) [Dkt. 25.][4] Following the status hearing, the parties discussed the drafting of the settlement agreement. (Rutkoff Decl. ¶ 15; Baron Decl. ¶ 18.)

Two days later, on August 6, 2003, Mr. Rutkoff delivered a proposed settlement agreement to Mr. Baron. (Rutkoff Decl. ¶ 15.) Mr. Baron reviewed the agreement and, on August 12, 2003, responded to Mr. Rutkoff with a letter identifying a number of revisions to the settlement agreement. (Defs.' Mot., Ex. E, Baron Aug. 12, 2003 Letter.) One of those revisions was that Plaintiff be provided his share of the management fees for the years 2002 and 2003. (*Id.* at 3.)

On August 22, 2003, Mr. Rutkoff delivered a statement reflecting Green Oaks' income and expenses through July 2003, pursuant to Mr. Baron's request for that financial information at the August 4 status hearing, as well as a letter to Mr. Baron, stating: "All or substantially all of the issues raised in your letter dated August 12, 2003 were not part of our settlement agreement, with the possible exception of some of the terms listed in paragraph 1 [relating to the Listing Agreement]."

_____

[4] The court noted that no decision was being suggested as to whether there was an enforceable settlement agreement. (Tr. Aug. 4, 2003 at 7-8.)

-7-

(Defs.' Mot., Ex. F, Rutkoff Aug. 22, 2003 Letter at 2.) With respect to Mr. Baron's suggested revision to include management fees, Mr. Rutkoff stated:

> Management fees have been a bone of contention from day one, and you never carved out any claims from your offer to settle based on our side paying all of the transaction costs. Indeed, the only time you used the word "retrospective" was in connection with the alternative offer for [Plaintiff] to retain and to prosecute those claims with [Plaintiff] paying half of the costs. And, when you explained this concept to Magistrate Judge Brown, you identified these claims [for the unpaid management fees] as the purported monetary and accounting claims that were not addressed by a sale of the property.

(*Id.* at 1.)

On August 25, 2003, another status hearing was held. Mr. Baron advised the court that Plaintiff "asked that he be paid the management fee for 2002 and 2003," and that "Defendants have taken the position that this was a claim that was waived or released or is to be released as part of the settlement, and that has sort of. . . brought us to a point of loggerheads." (Defs.' Mot., Ex. G, Tr. Aug. 25, 2003 at 3-4.) Mr. Baron then stated: "I mentioned the fact that. . . in exchange for the payment of the cost of the sale. . . we would release our – what I called retrospective claims. We didn't have any fundamental discussion about what those retrospective claims are." (*Id.* at 11-12.)

Subsequently, Defendants agreed to all of the issues raised in Mr. Baron's letter with one exception, the unpaid management fees for the years 2002 and 2003. (Pl.'s Opp'n at 11-12.) When the parties were unable to resolve that issue, Defendants brought the present Motion.

## Analysis

### I.   Legal Principles

"A settlement agreement is a contract and as such, the construction and enforcement of

settlement agreements are governed by principles of local law applicable to contracts generally." *Laserage Tech. Corp. v. Laserage Lab Inc.*, 972 F.2d 799, 802 (7th Cir. 1992) (quoting *Air Line Stewards and Stewardesses Assoc. v. Trans World Airlines, Inc.*, 713 F.2d 319, 321 (7th Cir. 1983); *see also Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000); *Abbott Labs. v. Alpha Therapeutic Corp.*, 164 F.3d 385, 387 (7th Cir. 1999).[5] Under Illinois law, an oral settlement agreement is enforceable "as long as there is clearly an offer and acceptance of the compromise and a meeting of the minds as to the terms of the agreement." *Wilson v. Wilson*, 46 F.3d 660, 666 (7th Cir. 1995) (quoting *Brewer v. National RR. Corp.*, 628 N.E.2d 331, 335 (Ill. 1993)).[6] Illinois law follows the objective theory of intent; whether the parties had a "meeting of the minds" is determined not by their actual subjective intent, as in their actual mental processes, but by what they expressed to each other. *Laserage Tech. Corp.*, 972 F.2d at 802; *see also Empro Mfg. Co., Inc. v. Ball-Co Mfg., Inc.*, 870 F.2d 423, 425 (7th Cir. 1989) ("Contract law gives effect to the parties' wishes, but they must express these openly. Put differently, 'intent' in contract law is objective rather than subjective . . . .").

In addition, "a binding agreement requires a meeting of the minds or mutual assent as to all

---

[5] *See also Allstate Fin. Corp. v. Utility Trailer of Illinois, Inc.*, 936 F. Supp. 525, 528 (N.D. Ill. 1996) (stating that a motion to enforce a settlement agreement is essentially the same as a motion to enforce a contract and ordinary contract construction rules apply); *Hyde Park Union Church v. Curry*, 942 F. Supp. 360, 363 (N.D. Ill. 1996) (stating that a contract analysis must occur to determine whether a contract to settle was formed); *Schapp v. Executive Indus., Inc.*, 760 F. Supp. 725, 726 (N.D. Ill. 1991) (stating that the traditional elements of a contract must be present before a court will enforce a settlement agreement).

[6] The parties correctly agree that Illinois law applies to this dispute. *See* Pl.'s Opp'n at 7; Defs.' Mot. ¶ 20; Defs.' Reply at 5. *See also Pohl v. United Airlines, Inc.*, 213 F.3d 336, 338 (7th Cir. 2000) (holding that the enforceability of a settlement agreement is governed by local contract law).

material terms." *Abbott Labs.*, 164 F.3d at 387 (emphasis added); *see also Hyde Park*, 942 F. Supp. at 363 (district courts may enforce settlement agreements only if the parties have reached agreement on all material terms) (citation omitted). Accordingly, "settlement agreements that do not explicitly resolve ancillary issues can nonetheless be enforceable." *Porter v. Chicago Bd. of Educ.*, 981 F. Supp. 1129, 1131 n. 4 (N.D. Ill. 1997). Similarly, "[t]he fact that the parties le[ave] some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement." *Id.* (citation omitted); *see also Dawson v. General Motors Corp.*, 977 F.2d 369, 374 (7th Cir. 1992) (stating that "agreements with open terms . . . have been held to constitute potentially enforceable contracts," and that "Illinois courts have not been shy about enforcing promises made in the context of ongoing negotiations and often involving preliminary or 'incomplete' agreements").

Thus, "[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon, but if the essential terms are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Academy Chicago Publishers v. Cheever*, 578 N.E.2d 981, 984 (Ill. 1991). In other words, the essential or material terms of a contract must be sufficiently "definite" in order for a contract to be enforceable. *Trendmasters, Inc. v. Walgreen Co.*, No. 95 C 5379, 1996 WL 422273 at *3 (N.D. Ill. July 24, 1996) (Zagel, J.); *see also Empro Mfg.*, 870 F.2d at 426 (stating that parties may "approach agreement in stages, without fear that by reaching a preliminary understanding they have bargained away their privilege to disagree on the specifics"). Under Illinois law, "[a] contract is sufficiently definite and certain to be enforceable if the court is enabled from the terms and provisions thereof, under proper rules of construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Cheever*, 578 N.E.2d at 983 (quotation omitted). The "offer must be so definite as to its material

-10-

terms or require such definite terms in the acceptance that the promises and performances to be rendered by each party are reasonably certain." *Id.* (quoting 1 Williston, Contracts §§ 38 through 48 (3d ed. 1957), 1 Corbin, Contracts §§ 95 through 100 (1963)). In short, as long as the parties have an objective basis for determining when the other party breached the oral settlement agreement, the contract is sufficiently definite. *Wilson*, 46 F.3d at 667.

Relatedly, the fact that a formal written document is anticipated but then is never created or finalized does not preclude enforcement of a specific preliminary promise. *Dawson*, 977 F.2d at 374; *see also Mattingly v. City of Chicago*, 897 F. Supp. 375, 377 (N.D. Ill. 1995) (quoting *United States ex rel Great Lakes Plumbing & Heating Co. v. Orr Constr. Co.*, 560 F.2d 765, 769 (7th Cir. 1997) that an agreement is not invalid simply because it calls for the parties to reach another agreement in the future if "the terms to be agreed upon in the future can be determined independent of a party's mere 'wish, will, and desire,' either by virtue of the agreement itself or by commercial practice or other usage or custom"); *Thermos Co. v. Starbucks Corp.*, No. 96 C 3833, 1998 WL 299469 at *4 (N.D. Ill. May 29, 1998) (Kocoras, J.) ("a contract can be formed before there is an official document memorializing the deal" (quotation omitted)). However, "[w]here the reduction of an agreement to writing and its formal execution is *objectively intended* by the parties as a *condition precedent* to its completion, there can be no contract until then, even if the actual terms have been agreed upon." *Trendmasters, Inc.*, 1996 WL 422273 at *2 (emphasis added); *see also Abbott Labs.*, 164 F.3d at 388-89 (agreeing that informal writings between parties can constitute a binding settlement agreement unless the parties decide to expressly condition their deal on the signing of a formal document, and stating that "[a]n agreement 'in general' with a clear contemplation that further negotiations as to material terms will be required is simply not enough

-11-

to form ties that bind").

Finally, it is important to note that "a mere change of mind is not sufficient grounds for setting aside a settlement agreement." *Porter*, 981 F. Supp. at 1132 (quoting *Moore v. Cooper*, No. 94 C 788, 1996 WL 207187 at *2 (N.D. Ill. Apr. 24, 1996) (Lindberg, J.)). As the Seventh Circuit has stated, "[a] party to a settlement cannot avoid the agreement merely because he subsequently believes the settlement insufficient . . . . If a party to a . . . suit who has previously authorized a settlement changes his mind . . . , that party remains bound by the terms of the agreement." *Glass v. Rock Island Refining Corp.*, 788 F.2d 450, 454-55 (7th Cir. 1986) (quotation omitted).


## II.     Issues In Dispute Here

Defendants argue that a binding and enforceable agreement exists in this case because there was an unambiguous offer made in the presence of the court, an undisputed acceptance without any conditions or qualifications attached to it, and conduct by the parties indicating an intention to be bound. (Defs.' Mot. ¶ 26.) Plaintiff, in response, asserts that Mr. Baron never made an offer involving a release of Plaintiff's claim for management fees, as Defendants contend he did. (Pl.'s Opp'n at 2-3.) Plaintiff next argues that no enforceable agreement was reached in this case because there was only an agreement "in principle." (*Id.* at 6-12.) In support of that contention, Plaintiff argues that a detailed written settlement agreement was required to document the specific terms agreed on by the parties, which never occurred, and there was no meeting of the minds between the parties. (*Id.*) Plaintiff further argues that any oral agreement reached between the parties would be unenforceable in any event as it would violate the statute of frauds. (*Id.* at 12-13.) In a footnote in the factual background section of his brief, Plaintiff states that if Mr. Baron made an offer involving

a release of Plaintiff's claim to management fees, he did not have the authority to do so. (*Id.* at 3 n. 2.)

To determine whether an enforceable settlement agreement exists in this case, the following issues must be addressed: (1) whether Mr. Baron made an offer at the July 18, 2003 settlement conference that included a release of Plaintiff's claim for management fees; (2) whether the parties reached an enforceable agreement; and (3) whether the agreement is enforceable under the statute of frauds. Additionally, the issue of Mr. Baron's authority will be considered, although Plaintiff never properly presented that argument.

### A.   *Mr. Baron's offers at the July 18, 2003 settlement conference.*

Defendants assert that the offer made by Mr. Baron on July 18, 2003, which Defendants accepted, included a release of Plaintiff's claim for unpaid 2002 and 2003 management fees. According to Defendants, the offers made during the July 18, 2003 telephone conference were as follows:

1)   "A sale of the property by a public, absolute auction; payment by defendants of all auction expenses; and a complete release by plaintiff of all claims against the defendants related to Green Oaks." (Rutkoff Decl. ¶¶ 9, 10); and

2)   "A sale of the property by a public, absolute auction; payment [of] one-half of the auction expenses by plaintiff; payment of one-half of the auction expenses by the defendants; and the continuation of the Case for the purpose of allowing plaintiff to prosecute his monetary claims related to Green Oaks that, according to [Baron], would not be resolved by an auction of the property." (*Id.*)

Defendants contend that the first offer included a release of *all* claims related to Green Oaks and did not carve out an exception for the unpaid management fees, as Plaintiff now claims. (Defs.' Mot. ¶ 18.) In support of that contention, Defendants rely on the fact that Mr. Baron specifically referred

to the claim for management fees as an example of the type of claim that would not be resolved under the second settlement offer, when asked by the court to explain why all of Plaintiff's claims would not be resolved by an auction of the property as the second offer set forth. (Rutkoff Decl. ¶ 10; Baron Decl. ¶ 12.)

Plaintiff claims that the "offers" were not offers at all, but, rather, "two general concepts for the sale of Green Oaks." (Pl.'s Opp'n at 2.) Mr. Baron, in his declaration, describes the two "general concepts" stated at the July 18th telephone conference as follows:

1) "A sale of the property by a public, absolute auction; payment by defendants of all auction expenses; and a complete release by plaintiff of [the] retrospective claims against the defendants, related to Green Oaks." (Baron Decl. ¶ 9.)

2) "A sale of the property by a public, absolute auction; payment of one-half of the auction expenses by plaintiff; payment of one-half of the auction expenses by defendants; and the continuation of the Case for the purpose of allowing Plaintiff to prosecute his retrospective claims related to Green Oaks that, would not be resolved by an auction of the property." (*Id.*)

Defendants, in reply, assert that there is no material dispute about the offers made on July 18th because Mr. Baron's account is not materially different from Defendants' lawyers' recollections. (Defs.' Reply at 1-2.) Defendants also contend that the term "retrospective claims" clearly encompasses Plaintiff's claim for unpaid management fees. (*Id.* at 7-8). According to Defendants, there is "simply no evidentiary support" for Plaintiff's position that there was an agreement under which Plaintiff would release his retrospective claims relating to Green Oaks while still preserving his claim for the unpaid management fees. (*Id.* at 6.)

The court agrees with Defendants that the parties' versions of the offers set forth by Mr. Baron at the July 18, 2003 conference are not materially different. Under Plaintiff's version, Mr. Baron's first alternative offer included "a complete release by [P]laintiff of the retrospective claims

against [D]efendants related to Green Oaks." (Baron Decl. ¶ 9.) The only difference from Defendants' position is that Plaintiff contends that Mr. Baron "always reserved the management fee issue." (Pl.'s Opp'n at 3.) Yet, Plaintiff does not provide any evidence that Mr. Baron "reserved" Plaintiff's claim for management fees. Plaintiff does not contend that Mr. Baron expressly stated, in conjunction with the first offer, that Plaintiff was reserving the claim for unpaid management fees set forth in the Amended Complaint. Nor does Plaintiff deny that Mr. Baron specifically identified Plaintiff's claim for management fees as an example of the type of claim that would continue to be litigated under the second settlement offer, in response to the court's specific question. Likewise, Plaintiff does not explain why the term "retrospective claims" would not include Plaintiff's claim for management fees.[7] Plaintiff asserts, citing paragraph 12 of Mr. Baron's declaration, that Mr. Baron never expressly stated that he was releasing Plaintiff's claim for unpaid management fees. (Pl's Opp'n at 3.) That paragraph of Mr. Baron's declaration does not support Plaintiff's argument. On the contrary, by identifying the claim for management fees as the type of claim that would *not* be released under the second alternative, Mr. Baron communicated Plaintiff's intention that the claim for management fees was one that *would be* released under the first alternative in exchange for Defendants' bearing the expenses of the auction. Significantly, that conclusion is in accordance with

---

[7] Plaintiff suggests--again in a footnote--that the management fees were a "non-issue" because Defendants had previously agreed to pay Plaintiff his share. (Pl.'s Opp'n at 3 n.1.) However, there is no factual support in the record for such an agreement, and no such agreement is mentioned in Plaintiff Stephen Robin's affidavit. (Pl.'s Opp'n, Ex. B, Aff. of Stephen Robin.) Furthermore, as discussed above, the Amended Complaint filed in January 2003 specifically alleges that Defendants have been diverting management fees from the venture without Plaintiff's knowledge or consent, but does not allege any subsequent agreement to pay Plaintiff a share of those fees. (Am. Compl. ¶¶ 23, 27.)

this court's recollection of the offers set forth by Mr. Baron at the July 18th telephone conference.[8]

Accordingly, the court finds that the settlement offer accepted by Defendants included a release of

all claims related to Green Oaks and did not carve out an exception for Plaintiff's claim for unpaid

management fees.


### B.    Whether an enforceable agreement was reached.

Defendants argue that an enforceable agreement was reached and that Plaintiff's demand for

the unpaid management fees is an attempt to either change the parties' agreement or back out of it

altogether. (Defs.' Reply at 13.)  As discussed above, they assert that an unambiguous offer was

tendered, an undisputed acceptance without any qualifications was made, and an intention to be

bound was displayed by the parties. (Defs.' Mot. ¶ 26.)

Plaintiff responds that the parties reached only an unenforceable agreement "in principle."

(Pl.'s Opp'n at 6-7.)  In support of that contention, Plaintiff argues that a written agreement was

required to document the specific terms agreed upon (*Id.* at 6), and that there was no meeting of the

---

[8] Thus, an evidentiary hearing on that issue is not necessary. *See Wilson*, 46 F.3d at 664-65 (affirming district court's refusal "to conduct a redundant hearing on what [the judge] perceived as a completed agreement achieved by the parties in open court," and stating that a hearing has been necessary where "the only evidence supporting an agreement was the affidavits and briefs of one party's counsel stating that the parties had reached an agreement outside the presence of the court" and the court needed to "pierce through the attorneys' conflicting affidavits and briefs and determine if the parties had in fact reached an agreement").  Moreover, neither party has contended that an evidentiary hearing should be held in this case, and Defendants have argued that no purpose would be served by an evidentiary hearing. (Defs.' Reply at 13.)  *See Herrnreiter v. Chicago Housing Auth.*, 281 F.3d 634, 637 (7th Cir. 2002) (if the terms of the settlement are not put on the record, "the district judge or magistrate judge may remember the terms and thus readily enforce the agreement"); *Allstate*, 936 F. Supp. at 529-30 (settlement agreement enforced without evidentiary hearing where the decision was based on conduct witnessed by the court).

minds as to either the terms of the release or various other details of the parties' agreement, which were either left unresolved or never discussed. (*Id.* at 9-12.)

1.   The parties did not make a written agreement a condition precedent.

Plaintiff argues that there can be no enforceable agreement because the parties made a written settlement agreement a condition precedent to their agreement, but never executed a written agreement. (Pl.'s Opp'n at 5-7, 14.) In support of that argument, Plaintiff contends that, "[a]t every turn, [he] has asserted that. . . a detailed written settlement document would be required to document the specific terms agreed upon by the parties." (*Id.* at 6.) That assertion, Plaintiff argues, was consistent with Defendants' demand in their acceptance letter that a release be executed. (*Id.* at 5.) Defendants argue that their acceptance was unqualified and not conditioned on the parties' execution of any written document. (Defs.' Reply at 7.)

The court concludes that the parties did not make a written settlement agreement a condition precedent to an enforceable agreement. When Mr. Baron put the two offers on the table during the July 18, 2003 conference with the court, he did not state that a written settlement document was a condition precedent to a binding agreement, nor did he make such a demand at any time before Defendants accepted the settlement offer.[9] Similarly, Mr. Rutkoff's letter on behalf of Defendants accepting "unconditionally" one of the two offers did not state that the execution of a written document was a condition precedent to a binding agreement between the parties. (Rutkoff July 30,

_____

[9] Notably, under this court's Standing Order for Settlement Conference, the parties are required to come to the conference with authority to make a "final and binding settlement." *Standing Order for Settlement Conference* <http://www.ilnd.uscourts.gov/JUDGE/BROWN/sofsc2003.pdf>

-17-

2003 Letter.) He stated: "Please call me at your earliest convenience so that we can discuss the mechanics of entering into a final and binding agreement *with David Kaufman* [who submitted the auction proposal] and getting the case dismissed with prejudice." (*Id.*) (emphasis added). Mr. Baron's statement at the August 4, 2003 status hearing that a written settlement document would be needed as "with all settlements," and Mr. Rutkoff's subsequent draft of a written agreement to memorialize the terms of the oral agreement do not prove that a written agreement was a condition precedent to a binding agreement.[10] It is well-established that an oral settlement agreement can be binding and enforceable. *See Dawson*, 977 F.2d at 374 (stating that "[t]he fact that a formal written document is anticipated does not preclude enforcement of a specific preliminary promise"); *Allstate*, 936 F. Supp. at 528 (finding that parties intended to be bound and that written document was only to memorialize terms of oral agreement and was not a condition precedent to final oral agreement); *Mattingly*, 897 F. Supp. at 377 (stating that "[t]he agreement is not invalid simply because it calls for the parties to reach another agreement in the future"); *Schapp*, 760 F. Supp. at 728 (stating that the fact that an agreement was never formally executed does not preclude finding that an enforceable agreement was reached, as nothing in acceptance letter was conditional and there was no evidence that a written document was a condition precedent to the settlement); *Porter*, 981 F. Supp. at 1131 (finding that a binding agreement was reached because "[t]he subsequent drafting of the written documents was only to memorialize the terms of the oral agreement; neither a written settlement document nor approval of the agreement by any non-party was a condition precedent to the final oral agreement").

---

[10] Specifically, Mr. Baron stated: "I do believe that we have a conceptual framework for settlement. What I told Mr. Rutkoff on the phone this morning is that, with all settlements, we're going to need to work through a document to do this." (Tr. Aug. 4, 2003 at 3.)

2.    There was a meeting of the minds.

Plaintiff next argues that there was no meeting of the minds as to the specific terms of the release, referring to Plaintiff's belief that the agreed release excluded his claim for unpaid management fees. (Pl.'s Opp'n at 9.) In support of his contention, Plaintiff argues that "[w]hile [Mr.] Rutkoff thought that the issue was resolved, [Mr.] Baron did not agree." (*Id.*) Plaintiff further argues that the phrase "release from Stephen Robin," as used by Mr. Rutkoff in his letter accepting Mr. Baron's first proposal, has no "fixed meaning" and the evidence reflects no subjective meeting of the minds as to the meaning of that phrase. (*Id.*)

Defendants argue that there is no material dispute about the terms of the release because the words used by Mr. Baron in his declaration to describe the release are in accordance with Mr. Rutkoff's recollection and clear in meaning: "[A] complete release by plaintiff of the retrospective claims against defendants, related to Green Oaks." (Baron Decl. ¶ 9.)

"[W]hether [the parties] had a meeting of the minds is determined by reference to what the parties expressed to each other in their writings, not by their actual mental processes." *Laserage Tech. Corp.*, 972 F.2d at 802. *Accord Skycom Corp. v. Telstar Corp.*, 813 F.2d 810, 814 (7th Cir. 1987) (applying Wisconsin law) (stating that the "intent of the parties [to be bound] must necessarily be derived from a consideration of their words, written and oral, and their actions"). The court concludes that the parties' objective manifestations of intent in this case (*i.e.*, the parties' words, writings and conduct) demonstrate a meeting of the minds as to the terms of the settlement. In particular, there was a meeting of the minds as to the scope of the release (or, more specifically, whether the release covered Plaintiff's claim for management fees). As discussed above, the parties do not disagree that Mr. Baron offered, in exchange for Defendants' payment of all expenses

associated with the sale of Green Oaks by a public, absolute auction, "a *complete* release. . . of the retrospective claims against defendants, related to Green Oaks." (Baron Decl. ¶ 9) (emphasis added). Thus, regardless of the parties' subjective intentions, the parties objectively agreed to a settlement in which Plaintiff would release his claim for management fees.[11]

3.    The terms of the agreement are sufficiently definite.

Plaintiff argues that only a "conceptual framework for settlement" was agreed upon, and that framework was contingent upon the agreement of additional, specific terms that were never discussed or resolved. (Pl.'s Opp'n at 4, 6.) Plaintiff argues that there was no "meeting of the minds" regarding those additional terms, which he identifies as the unpaid management fees (discussed above), the type of listing agreement, the accounting, the interim operation of the center, the timing of the sale, the release and dismissal of the lawsuit, the dissolution of the land trust, and a possible § 1031 tax-deferred exchange. (*Id.* at 4, 10-11.) In his Opposition, Plaintiff identified those issues as "less significant issues." (*Id.* at 4.) At oral argument, however, Plaintiff's attorney described those issues as material to the agreement.[12] Plaintiff relies on the fact that, after Mr.

---

[11]  As a final point, Plaintiff also refers to the fact that the minute order entered after the August 4, 2003 status hearing stated that " [the] parties report that a settlement agreement has been reached in principle." (Order, Aug. 4, 2003.) [Dkt. 25.] However, that minute order is not determinative here because the court specifically stated at the hearing that "there may well be a binding and enforceable settlement at this point – I'm not going to opine on that point." (Tr. Aug. 4, 2003 at 6-8.)

[12]  When questioned at oral argument regarding the significance of the § 1031 exchange issue, Plaintiff's attorney stated that that issue was important because if the property was not sold at an appropriate time, the parties would face many negative tax consequences. In his August 12 letter, Mr. Baron states that one or more of the parties "may" want to take advantage of a § 1031 exchange and the settlement agreement should provide that, if necessary, the parties will facilitate such an exchange. (Baron Aug. 12, 2003 Letter at 4.)

Rutkoff sent the acceptance letter and draft settlement agreement to Mr. Baron, the parties continued negotiating over issues such as the timing of the sale, mutual releases, and tax advantages. (Pl.'s Opp'n at 10.) In addition, Plaintiff relies on the fact that Defendants gave Plaintiff current financial reports concerning Green Oaks after Defendants had accepted Plaintiff's settlement offer. (*Id.*)

Defendants state that the issues identified by Mr. Baron in his letter responding to Defendants' draft settlement agreement were "nits [that Mr. Baron had] picked" and "not part of [the parties'] settlement agreement" and that agreements may still be enforced when unresolved details are left for the parties' attorneys to work out afterwards. (Rutkoff Aug. 22, 2003 Letter at 2.) Finally, Defendants point out that many of the details had been resolved, and there was no reason to believe that the auction would not have proceeded pursuant to the terms on which they had reached agreement.

Defendants are correct in noting that agreements may be enforceable even when details are left unresolved or for the parties' attorneys to work out afterwards. *See Porter*, 981 F. Supp. at 1131 n. 4 ("[t]he fact that the parties left some details for counsel to work out during later negotiations cannot be used to abrogate an otherwise valid agreement" (quotation omitted)); *Cheever*, 578 N.E.2d at 984 ("[a] contract may be enforced even though some contract terms may be missing or left to be agreed upon"). However, a purported agreement can fail if "the contractual language governing performance is so indefinite that [the court] cannot say what adequate performance would be." *Orr*, 560 F.2d at 769; *see also Trendmasters, Inc.*, 1996 WL 422273 at *3 (stating that "[t]he essential terms of a contract must be definite and enforceable in order for a contract to be enforceable" (citation omitted)). Under Illinois law, an agreement is sufficiently definite and certain to be enforceable "if the court is enabled from the terms and provisions thereof, under proper rules of

construction and applicable principles of equity, to ascertain what the parties have agreed to do." *Cheever*, 578 N.E.2d at 983 (quotation omitted). However, if the essential terms "are so uncertain that there is no basis for deciding whether the agreement has been kept or broken, there is no contract." *Id.* at 984. "The critical issue is usually whether there is a 'fall-back standard' comparable to the [Uniform Commercial] Code's 'reasonable price' that is adequate to enable a court to supply the open term should negotiations fail." E. Allan Farnsworth, *Precontractual Liability and Preliminary Agreements: Fair Dealing and Failed Negotiations*, 87 Colum. L. Rev. 217, 255 (1987).

In this case, two certain terms are found in the expressed agreement, namely that Defendants would pay all of the expenses to hold a public, absolute auction of Green Oaks, and, in exchange, Plaintiff would release his claims against Defendants relating to Green Oaks. In the court's view, those terms are sufficiently definite because "the promises and performances to be rendered by each party are reasonably certain" *Cheever*, 578 N.E.2d at 983 (quotation omitted). Furthermore, there is an objective basis for determining if the other party breached the oral settlement agreement. *Wilson*, 46 F.3d at 667.

The parties' agreement to sell their property by a public, absolute auction is sufficiently definite because the parties had previously agreed on the terms of that auction, *e.g.*, a method of sale, DK Realty Partners' fees, the marketing costs, the timing of the auction, the timing of the closing, listing agreement requirements, and the marketing proposal, by agreeing to the DK Realty Proposal. The parties could proceed with an auction based on those terms notwithstanding the fact that, upon further reflection, one or both parties might have wanted to adjust some of the details, such as the schedule set out in the DK Realty Proposal, to achieve a timing more beneficial for tax planning

-22-

purposes. The fact that an agreement had not yet been executed with DK Realty is irrelevant to the issue of whether a sufficiently definite agreement had been reached by Plaintiff and Defendants. *See Dawson*, 977 F.2d at 373-74 (finding that terms of offer were not too vague or uncertain to form valid contract because two relatively certain terms existed).[13]

Plaintiff admits that, in the parties' subsequent negotiations (after Defendants accepted Plaintiff's offer), Defendants agreed to all of Plaintiff's demands, except for the payment of management fees. (Pl.'s Opp'n at 11-12.) Plaintiff's counsel stated at the September 16, 2003 hearing: "It is [Plaintiff's] position that the case is settled in principal [sic]. *The only outstanding issue that we believe we do not have an agreement on is past management fees*." (Defs.' Reply, Ex. B, Tr. Sept. 16, 2003 at 4) (emphasis added).[14] That fact supports Defendants' position that the topics of subsequent negotiation were not material terms preventing the formation of a sufficiently complete and definite agreement.

Those facts distinguish this case from *Thermos Co. v. Starbucks Corp.*, No. 96 C 3833, 1998

---

[13] Plaintiff also argues against the enforceability of the agreement on the grounds that there was no agreement read into the record during the July 18th conference; that there was no court reporter present at the conference; and that the acceptance of the alleged offer occurred 10 days after the conference. (Pl.'s Opp'n at 10.) None of those factors leads to a finding that no agreement was reached or that the agreement is unenforceable. The fact that no agreement was read into the record on July 18th is of no significance because no agreement was made that day; instead, two offers were tendered and Defendants' attorney stated that he would take the offers back to his clients for consideration. Likewise, the fact that there was no court reporter present at the conference does not somehow make Plaintiff's offer ineffective. *See Lynch, Inc. v. SamataMason, Inc.*, 279 F.3d 487, 489-92 (7th Cir. 2002). Finally, the fact that the acceptance was provided 10 days after the settlement conference occurred has no bearing here, as the evidence does not show (and Plaintiff does not contend) that the offers were not still open for acceptance at that time.

[14] Defendants attach the transcript of proceedings from the September 16, 2003 hearing to their reply brief as Exhibit B. (Defs.' Reply at 3.) However, the caption page from the August 25, 2003 hearing was inadvertently placed at the front of Exhibit B.

-23-

WL 299469 (N.D. Ill. May 29, 1998) (Kocoras, J.), cited by Plaintiff. In *Thermos*, the settlement reached at an out-of-court mediation foundered on the parties' inability to implement their agreement to agree on a "commercially acceptable noninfringing process" for the defendants to use. 1998 WL 299469 at *6. The court could not enforce the settlement agreement because there was no industry definition of the term, and the court had no definition to apply in the context. *Id.* The court observed that the parties' subsequent inability to negotiate a resolution of that issue further indicated the lack of a meeting of the minds on that point. *Id.*

In contrast, in this case, the parties' agreement that Plaintiff would release his claims is sufficiently definite. Plaintiff's reliance on *Orr* is misplaced. In the *Orr* case, the Seventh Circuit reversed the district court's decision to enforce a settlement agreement where the parties could not agree on how to implement their agreement to exchange "proper legal releases," a concept which the court found to be vague and to have no commonly understood meaning. 560 F.2d at 769-71. As a threshold matter, however, the Seventh Circuit was applying federal law, not Illinois contract law, to determine the enforceability of the settlement agreement in the *Orr* case, which was brought under the Miller Act. *Id.* at 769. The Seventh Circuit subsequently distinguished *Orr* on that ground in the *Wilson* case, the facts of which are much closer to the present case. 46 F.3d at 667. In *Wilson*, the Seventh Circuit, applying Illinois law, affirmed the district court's decision to enforce a settlement agreement where the parties in open court had agreed that, as part of the settlement, the plaintiff would be forever barred from bringing all claims against the defendants for any acts that gave rise to his suit. *Id.* at 662, 667. Although there was "quibbling" over whether that would be achieved by mutual releases or a covenant not to sue, the court ultimately concluded that there was an enforceable agreement that the plaintiff would drop all of his claims against the defendants in

exchange for the promised payment. *Id.* The fact that the legal form had not been specified was of "no consequence." *Id.* at 667. "[T]he fact is . . . the parties had an objective basis for determining when either party had breached the oral settlement agreement. No more is required to overcome a challenge to a contract's enforceability due to alleged indefiniteness." *Id.*

Here, the only real dispute raised by Plaintiff about the nature of the release is whether the "complete release of all retrospective claims against the defendants related to Green Oaks," as expressed by Mr. Baron (Baron Decl. ¶ 9), included the release of the management fees claim, and, as discussed above, it is clear that it did.

### C. The statute of frauds is not applicable here.

Plaintiff asserts that even assuming a settlement agreement between the parties was formed, it cannot be enforced because it violates the statute of frauds. (Pl.'s Opp'n at 12-13.) Citing *Hartenbower v. Uden*, 90 N.E. 298 (Ill. 1909), Plaintiff argues that the settlement agreement is unenforceable without a written contract signed by either Plaintiff or his attorney because the agreement "concerns the sale of Green Oaks." (Pl.'s Opp'n at 12-13.)

The Illinois version of the statute of frauds, the Frauds Act, provides in part:

> No action shall be brought to charge any person upon any contract for the sale of lands, tenements or hereditaments or any interest in or concerning them, for a longer term than one year, unless such contract or some memorandum or note thereof shall be in writing, and signed by the party to be charged therewith, or some other person thereunto by him lawfully authorized in writing, signed by such party.

740 Ill. Comp. Stat. § 80/2.

As Defendants point out, Plaintiff is simply wrong in arguing that any contract that "concerns" a sale of property must be in writing. Section 2 of the Frauds Act is applicable only to

those agreements that convey some interest in real property. *See, e.g., Fitch v. King*, 116 N.E. 624 (Ill. 1917) (creation of an interest in a partnership whose purpose to sell real property is not a sale of real estate subject to statute of frauds); *Manlove v. Lemmon*, 111 N.E. 739, 741 (Ill. 1916) (agreement for survey of land incident to auction of land is enforceable and not subject to statute of frauds); *In re Senese v. Senese*, 245 B.R. 565, 577 (Bankr. N.D. Ill. 2000) (oral agreement that debtor would provide cash contribution toward purchase of real estate was not a contract to buy or sell land and was not unenforceable under the statute of frauds). The settlement agreement in this case does not purport to convey any interest in Green Oaks. The settlement agreement here merely lays the groundwork for a future auction sale and disposes of the case. In *Vogt v. Bartelsmeyer*, 636 N.E.2d 1185, 1191 (Ill. App. 1994), the court rejected as "a red herring" the argument that an agreement settling the amount of compensation for the taking of real property under eminent domain powers was unenforceable under the statute of frauds. The court stated: "What defendants failed to consider is that the instant case is enforcement of a settlement agreement between the parties." *Id.*

A careful reading of the *Hartenbower* case cited by Plaintiff supports the conclusion that the statute of frauds is not applicable here. In that case, all of the heirs of William Patterson agreed to sell his property by an auction and entered into an agreement dated October 16, 1908 authorizing Benjamin Patterson to sell the property at an auction. *Hartenbower*, 90 N.E. at 298. Benjamin Patterson held the auction and plaintiff Hartenbower was the highest bidder, however, "no written contract or memorandum of sale was made." *Id.* at 299. Subsequently, one of the heirs refused to sign a deed conveying the property to Hartenbower. *Id.* The court held that the statute of frauds prevented the enforcement of the sale to Hartenbower because there was no written agreement to sell to Hartenbower, and the deed alone was not sufficient because it contained no mention of the terms

under which the sale to Hartenbower was made. *Id.* at 300. Relevant to Plaintiff's argument here is the *Hartenbower* court's conclusion that the October 16, 1908 agreement, in which the heirs agreed to sell the property by auction, "was not, however, a contract of sale." *Id.* at 299. Thus, the statute of frauds is not applicable to the settlement agreement in this case.

Defendants further argue that if the Frauds Act were otherwise deemed to apply to the settlement agreement here, a recent decision by the Illinois Appellate Court holds that the statute is satisfied by an agreement that is the product of a settlement conference conducted under the auspices of a judge. (Defs.' Reply at 8). The Appellate Court so held in *Rose v. Mavrakis*, 799 N.E.2d 469 (Ill. App. 2003), as a matter of first impression. The *Rose* court reasoned that "[w]hen parties reach a settlement agreement during a court-mandated settlement conference conducted in the judge's chambers and state the terms of that agreement in the judge's presence, there is no danger of enforcement of a contract which was, in fact, never made." *Id.* at 478. In the *Rose* case, both sides agreed that a settlement had been reached, and the judge repeated the terms in front of both parties, although no transcript or written order memorializing the settlement was prepared. *Id* at 472-73. Here, although no agreement was reached at the July 18, 2003 settlement conference, it is undisputed that the offer made in the presence of the court was "unconditionally" accepted two weeks later, on July 30, 2003, and had not been withdrawn in the interim. Thus, the purpose of the statute, "to prevent the fraudulent enforcement of asserted contracts that were in fact not made" (*id.* at 478), is satisfied under the facts here. Accordingly, if the statute of frauds were applicable to the settlement agreement at issue, it is satisfied here.

Therefore, Plaintiff's argument that the agreement is unenforceable because it violates the

statute of frauds is without merit.[15]

### D.    Mr. Baron had authority.

In a one-line footnote in his Opposition, Plaintiff states: "Baron never had the authority from [Plaintiff] Stephen to waive [the] claim [for management fees]. Exhibit A–Affidavit of Stephen Robin." (Pl.'s Opp'n at 3 n. 2.) If Plaintiff was attempting to assert lack of authority as a basis for denying Defendants' motion, Plaintiff provided no legal authority or analysis whatsoever to support that argument. Under the case law in this Circuit, Plaintiff's footnote "argument" need not even be considered by the court. *See, e.g., El Ranchito, Inc. v. City of Harvey*, 207 F. Supp. 2d 814, 822 (N.D. Ill. 2002) (court may treat argument raised in footnote as waived ) (citing *Dresser Indus., Inc., v. Gradall Co.*, 965 F.2d 1442, 1448 (7th Cir.1992)); *AAR Intl., Inc. v. Vacances Heliades S.A.*, 202 F. Supp. 2d 788, 796 n. 2 (N.D. Ill. 2002) (same); *Standard Bank & Trust Co. v. Village of Orland Hills*, 891 F. Supp. 446, 449 n. 2 (N.D. Ill. 1995) (same). *See also Rose v. United States*, 929 F. Supp. 305, 309 (N.D. Ill. 1996) (stating that "the paucity of argument on this issue in her response brief essentially waives the claim") (*citing Bakalis v. Golembeski*, 35 F.3d 318, 326 n. 8 (7th Cir. 1994)). Moreover, the fact that the suggestion was raised only in a footnote speaks volumes about its merit and credibility. If Mr. Baron had made an offer without Plaintiff's authority, Plaintiff would have made that argument the centerpiece of his opposition brief, instead of raising it only in a

---

[15] It is thus unnecessary to reach the other arguments made by Defendants as to why the statute of frauds is not applicable in this case: first, that the parties hold their interests in Green Oaks as tenants in common and an oral agreement to divide interests among tenants in common is binding without a written agreement (Defs.' Reply at 8-9); and, second, that the interests of partners in property owned by a partnership is considered personalty that is not subject to the statute of frauds for the purpose of settling a partnership's affairs. (*Id.* at 9.)

footnote. However, in the interest of presenting a complete report and recommendation to the District Judge, that issue will be discussed.

Although the authority of an attorney to represent a client in litigation is separate from the authority of an attorney to compromise or settle the lawsuit, "the existence of the attorney of record's authority to settle in open court is presumed unless rebutted by affirmative evidence that authority is lacking." *Shapo v. Tires N' Tracks, Inc.*, 782 N.E.2d 813, 823-24 (Ill. App. 2002). "Where a party silently stands by and permits his attorney to act in his behalf in dealing with another in a situation where the attorney may be presumed to have authority, the party is estopped from denying the agent's apparent authority as to third persons." *Id.* at 824 (citation omitted).

In this case, the parties' respective attorneys and principals (including Plaintiff) appeared for a settlement conference with this court on May 27, 2003, pursuant to this court's Standing Order, which requires that those who attend a settlement conference must have "full settlement authority." *Standing Order for Settlement Conferences* ¶ 2. When the parties did not settle that day, an order was entered continuing the conference to June 10, 2003, on which date the parties' counsel were to appear by telephone. (Order, May 27, 2003.) [Dkt 20.] The court held three more telephone settlement conferences with the parties' attorneys, on June 10, June 17, and July 18, 2003. Plaintiff was aware that there were ongoing settlement conferences with the court. (Defs.' Reply, Ex. A, Dep. of Stephen Robin at 249.) At no time during or between any of those four conferences did Plaintiff or his attorney advise anyone that Mr. Baron did not have authority to make proposals which, if accepted, could lead to the settlement of the case. The settlement conferences were conducted by the court and in the auspices of the court, and Mr. Baron appeared to be cloaked with the authority needed to settle the case. Under those circumstances, the burden rests on Plaintiff to rebut the

presumption that his attorney had the authority to make the offer at issue and settle the case. *See Shapo*, 782 N.E.2d at 824; *Twin City Fire Ins. Co. v. Country Mutual Ins. Co.*, 23 F.3d 1175, 1182 (7th Cir. 1994) (stating that when settlement offer was made in pretrial conference in the presence of the judge, the presumption of settlement authority was triggered).

Plaintiff has not rebutted that presumption. It is important to note that Plaintiff does *not* claim that Mr. Baron was not authorized to enter into negotiations that would be binding on Plaintiff. Plaintiff only asserts that Mr. Baron was not authorized to "waive" the management fees claim as part of the settlement. Nowhere in Plaintiff's Opposition does Plaintiff assert that this exemption from Mr. Baron's apparent authority was communicated to Defendants. Significantly, Mr. Baron did not "waive" Plaintiff's claim for management fees; the management fees and Plaintiff's other monetary claims were the *quid pro quo* for Defendants' agreement to pay the total expenses for the auction.

Plaintiff's footnote relies solely on Plaintiff's own affidavit, which contains no facts that might enable the court to conclude that Mr. Baron had acted without authority. (Robin Aff.) For example, Plaintiff does not describe in his affidavit what authority he gave Mr. Baron, or what claims were to have been released by the settlement, or how he anticipated the lawsuit could be dismissed if the claim for management fees was unresolved. Instead, Plaintiff's affidavit contains merely conclusory statements that "at no time did I ever authorize Steve Baron or anyone from Mandell Menkes and Surdyk, LLC to waive my claim for property management fees relative to the Green Oaks Shopping Center in this case," and that if Mr. Baron "waived my claim for property management fees. . . [he] acted without my authority, either express or implied." (Robin Aff. ¶ 3, 5.) Legal conclusions are not facts admissible in evidence. "[U]ltimate or conclusory facts and

conclusions of law, . . . cannot be utilized on a summary judgment motion." 9A Charles A. Wright et al., *Federal Practice and Procedure* § 2538, pp. 346-56. (3d ed. 1995). Plaintiff's affidavit is not sufficient to raise an issue of fact. *See Custom Cartage, Inc. v. Motorola, Inc*, No. 98 C 5182, 1999 WL 965686 at *4-5 (N.D. Ill. Oct. 15, 1999) (Kocoras, J.) (striking portions of affidavit because a party cannot create an issue of fact "by producing self-serving affidavits without factual support in the record or by relying on conclusory statements in affidavits").

It is significant that Plaintiff also submitted Mr. Baron's declaration, yet Mr. Baron does not state that his authority was limited – either generally or in the sense that he could not make a proposal that included a release of Plaintiff's claim for management fees. Moreover, as Defendants point out, Mr. Baron's declaration, unlike Plaintiff's affidavit, contains statements of fact and is in proper form. Mr. Baron's declaration states that he made one proposal that included "a complete release by plaintiff of retrospective claims against the defendants related to Green Oaks," and a second proposal under which the claims that would not be resolved by an auction of the property would be litigated, including "a portion of the management fees and commissions." (Baron Decl. ¶¶ 9, 12.) Notably, Mr. Baron does not state that there was a misunderstanding between him and his client as to the limits of his settlement authority.

Plaintiff's delay in raising his "lack of authority" argument further undermines its credibility. Plaintiff waited until October 21, 2003 (the date on which he filed his Opposition), more than two months after Mr. Rutkoff sent Defendants' acceptance letter, to raise any question about Mr. Baron's authority. Mr. Baron's August 12 letter, which specifically referred to Plaintiff's claim for management fees, does not allude to any lack of authority to make the management fees claim part of the settlement. Furthermore, neither of Plaintiff's attorneys raised lack of authority in any of the

-31-

several hearings before the filing of Plaintiff's Opposition. It is significant that Donald Kindwald, the attorney who replaced Mr. Baron in the case, did not mention Mr. Baron's alleged lack of authority when he first appeared in court on September 16, 2003, even though he stated that the issue of unpaid management fees was still outstanding. (Tr. Sept. 16, 2003 at 4.) Plaintiff's delay in raising a claim of lack of authority bolsters the conclusion that Mr. Baron did not lack the authority to make the offers that he made. *See Shapo*, 782 N.E.2d at 824 (affirming lower court's enforcement of settlement where, *inter alia*, party waited more than two months after agreement was entered to contest its validity); *Frazier v. Indiana Dept. of Labor*, No. IP01-0198-C-T/G, 2003 WL 21649931 at *5 (S.D. Ind. June 4, 2003) (Baker, M.J.) (recommending enforcement of settlement agreement where a party did not respond to a facsimile from his attorney confirming that the attorney had his authority to settle the case).

Finally, the excerpts from Plaintiff's deposition that were attached to Defendants' reply brief do not carry Plaintiff's burden of demonstrating that Mr. Baron lacked the authority to negotiate a settlement that included a release of Plaintiff's claim for management fees. Plaintiff had very limited recollection of the specifics of his conversations with Mr. Baron during the period of the various settlement conferences, although Plaintiff was aware that settlement conferences with the court were continuing.[16] Plaintiff testified that he knew that Mr. Baron had made an offer to settle the case, and also testified that Mr. Baron did not describe the offer nor did Plaintiff ask Mr. Baron to describe the offer. (Robin Dep. at 259.) Plaintiff admits that Mr. Baron faxed him Mr. Rutkoff's July 30 acceptance letter. (*Id.* at 262-63.) That letter expressly stated the terms as Defendants understood

---

[16] Plaintiff testified to an "understanding" of what Mr. Baron's instructions were, but could not remember what words he used to express that understanding. (Robin Dep. at 245, 247.)

them, including a release of *all* of Plaintiff's claims and dismissal of the lawsuit. (Rutkoff July 30, 2003 Letter) (emphasis added). Plaintiff testified that, after he received Mr. Rutkoff's letter, he told Mr. Baron that there were "so many loose ends," such as "the understanding of fees or any financial information," "items pertaining to closing costs," and "how much cash is on hand." (Robin Dep. at 264-65, 267.) He also testified that Mr. Baron expressed those "open items" in the August 12 letter. (*Id.* at 267.) Yet, as discussed above, Mr. Baron's responsive letter of August 12, 2003 does not refer to a lack of authority to negotiate the management fees claim. Plaintiff's position is further undermined by his testimony that, even as of the date of his deposition, October 23, 2003, he was unaware that Mr. Baron communicated more than one offer. (*Id.* at 270.) Plaintiff's deposition was taken *after* the filing (on October 21, 2003) of Plaintiff's Opposition, which included Mr. Baron's declaration expressly setting forth the two offers that he had communicated.

No evidentiary hearing is necessary on this point because Plaintiff has had an opportunity to present evidence and has failed to present a genuine question on this point.[17] *See Degerman v. S.C. Johnson & Son, Inc.*, 875 F. Supp. 560, 562 (E.D. Wis. 1995) ("I do not believe that an evidentiary hearing would assist the court in resolving this matter. The parties have already submitted affidavits from [the parties' attorneys]. It is unlikely that an evidentiary hearing would elucidate facts beyond those which the parties have already presented in their affidavits.").

Plaintiff's arguments illustrate a point made by the Seventh Circuit in *Pohl*: "Some litigants in pursuing settlement of their claims hold the belief that they can change their mind at any time

---

[17] Defendants were ordered to include in the deposition excerpts attached to their Reply any portions of Plaintiff's deposition that Plaintiff's counsel designated. (Order, Oct. 28, 2003.) [Dkt 38.] Plaintiff has not stated that any designated portions were omitted.

before they actually sign the settlement agreement. As this case illustrates, that perception is often unfounded in the law." 213 F.3d at 337. In this case, Plaintiff entered into a binding agreement with Defendants, regardless of the fact that he did not sign a written settlement agreement.

## Conclusion

For the foregoing reasons, this court respectfully recommends that Defendants' Motion to Enforce Settlement Agreement be granted. Specific written objections to this report and recommendation may be served and filed within 10 business days from the date that this order is served. Fed. R. Civ. P. 72(a). Failure to file objections with the district court within the specified time will result in a waiver of the right to appeal all findings, factual and legal, made by this court in the report and recommendation. *Lorentzen v. Anderson Pest Control*, 64 F.3d 327, 330 (7th Cir. 1995).

Geraldine Soat Brown
United States Magistrate Judge

January 20, 2004